## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RENEE GWINN.<br><br>Plaintiff,<br><br>vs.<br><br>COMMUNITY HEALTH NETWORK,<br><br>Defendant. | Case No. 1:23-cv-117 |

## COMPLAINT

Plaintiff Renee Gwinn ("Plaintiff") brings this complaint against Community Health Network ("CHN") and alleges as follows:

### NATURE OF THE ACTION

1. This is an action for religious discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.*, and discrimination, hostile work environment, and retaliation pursuant to the Americans with Disabilities Act ("ADA"). Further, an action pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. Moreover, this Honorable Court has jurisdiction over Plaintiff's state law claims to the extent that she pleads them pursuant to 28 U.S.C. §1367.

**THE PARTIES**

2.  Plaintiff is a female citizen of the Commonwealth of Pennsylvania.

3.  CHN is a Federally Qualified Health Center which is a multifaceted organization, providing healthcare, dental care, vision care and other related healthcare services with its principal place of business in Western Pennsylvania at 1202 State Street, Erie, PA 16501.

**JURISDICTION AND VENUE**

4.  This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331 as one arising under laws of the United States. *See* 28 U.S.C. §1331.

5.  Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the "unlawful employment practice[s]" giving rise to this lawsuit took place within this district.

**FACTUAL BACKGROUND**

6.  Plaintiff is a 60-year-old female who worked as a Registered Nurse for Defendants from November 2020 until date of termination on March 31, 2022.

7.   On October 4, 2021, Plaintiff was diagnosed with COVID-19 and then tested by CHN's Toni Glomacki LPN Assistant to the Director of Infection Control and was placed off work until 10/14/2021.

8.   On October 6, 2021, Plaintiff received a Monoclonal infusion from Saint Vincent Infusion Center per a recommendation of the Director of Medical Services for CHN, Anthony Ignocheck MD, and as ordered by her primary

care provider, William Getson MD.

9.   On November 17, 2021, a COVID vaccination policy was initiated by Craig Ulmer ("Ulmer") Chief Executive Officer of CHN. It stated that all employees must begin vaccination by December 4, 2021, to comply and be fully vaccinated by January 4, 2022. It further stated, "Employees not in compliance with this policy will be subject to disciplinary action up to and including separation of employment." (See **Exhibit A**)

10. On December 2, 2021, Plaintiff submitted her medical exemption form and her religious exemption form to Monin. Plaintiff's medical exemption was approved on December 21, 2021, due to her prior infusion of monoclonal antibodies permitting Plaintiff to remain unvaccinated until January 13, 2022. However, at no time did the Defendants discuss accommodations based on natural immunity (See **Exhibit B**)

11. On December 14, 2021, Plaintiff received an email from Ulmer stating "We received your religious exemption. Our review committee will meet and discuss your request." (See **Exhibit C**)

12. On December 17, 2021, an administrative meeting was called by Defendants, but employees who had religious exemptions were not told, or included. CHN sent a copy of the meeting minutes to Plaintiff by accident, as Plaintiff was in the group email for administration. (See **Exhibit C**)

13. Notations from the meeting included: A meeting has been scheduled with Bishop Curtis Jones (Board member), Thierno Barry (Board Chair), Tyler Monin (Director of HR), and Craig Ulmer (CEO) to review religious exemptions. The meeting is scheduled for the week of 12/20. Mr Ulmer (CEO) stated "we need to move forward as if those staff are no longer here." "The accommodation that CHN is willing to make regarding exemptions is legal. The accommodation is unpaid leave." "We need to keep in mind that we may also be losing Renee. Mr. Ulmer suggested that we plan on her no longer being here and move forward." (See **Exhibit C**).

14. From December 25, 2021, through February 18, 2022, numerous vaccinated and boosted physicians and other employees were off work due to a COVID 19 Diagnosis. All leaves were at least a minimum of 10 days. This necessitated the Plaintiff doing numerous jobs while people were out to keep all three offices open and running. There were no discussions with Plaintiff during this time about her being unvaccinated, or an undue hardship for CHN existed.

15. On January 6, 2022, vaccinations were to be completed. However, no one went to the Plaintiff or any of the unvaccinated staff to tell them if their religious exemptions were accepted.

16. On January 6, 2022, the mandatory COVID vaccine policy was revised again.

17. On January 12, 2022, the mandatory Covid vaccine policy was revised.

18. On January 13, 2022, Plaintiff's religious exemption was granted per email by Monin. Plaintiff's paperwork was not signed or returned. The email stated "Your religious exemption request has been granted. Possible accommodation for your continued employment based on your religious exemption has yet to be determined. Additional communication on possible accommodation of your religious exemption will be forthcoming." (See **Exhibit C**)

19. The COVID-19 accommodation policy of CHN was revised again as of February 9, 2022. However, it was not released to staff until it was handed to Plaintiff on February 22, 2022.

20. The revised policy stated as to reasonable accommodations, "[u]pon further review, Community Health Net has determined that employing unvaccinated employees indefinitely would create an undue hardship to the organization. Such employment practice would undermine public trust and confidence in the organization. In response to current religious exemptions from unvaccinated employees, Community Health Net would be able to provide unpaid leave as an accommodation for those unvaccinated employees. Such employees would be entitled to thirty (30) days of unpaid leave starting March 1, 2022. The revised policy further stated, [u]se of previously earned Flexible Time Off (FTO) will be granted during the thirty (30) day period. Employees on this thirty (30) day leave of absence would not continue accruing FTO and

Extended Medical Leave (EML)."

21. The revised policy stated further that, "[i]f an unvaccinated employee decides to get the first dose of the COVID-19 vaccine and further commits to becoming fully vaccinated, then that employee can return to work from their leave of absence. If an unvaccinated employee decides after their thirty (30) days leave of absence concludes to remain unvaccinated, separation of employment would occur."

22. As noted above, on or about December 2, 2021, Plaintiff submitted a (3) page religious and medical exemption, reasonable accommodation request based upon her sincerely held religious beliefs that includes but is not limited to the Christian Doctrine. Furthermore, in that exemption request, Plaintiff explicitly stated she was experiencing anxiety due to the pressures being placed upon her regarding the vaccine.  (See **Exhibit C**)

23. On March 31, 2021, Plaintiff was terminated from her position for non-compliance with Defendants' Vaccine Mandate. (See **Exhibit C**)

24. Thus, Plaintiff avers she has been discriminated against on the basis of her religious beliefs, experienced a hostile work environment when Defendants refused to engage in good faith interaction regarding her request and subsequently demeaned and reprimanded Plaintiff, and finally Defendants retaliated against the Plaintiff by suspending her and then terminating her for

seeking remedies under the law due to her protected status.

25. Any reasonable person viewing these facts would deduce Defendants simply intended to undermine Plaintiff's religious beliefs and medical disability accommodation and that Defendants' grounds for denying Plaintiff's request for accommodations was pretextual.

26. Critically, the defendant had permitted requests for exemption based on medical and religion, employee's records of vaccine are "confidential and privileged" according to Defendant in its PHRC responses to the Plaintiff's PHRC Complaint, thus the public would have no knowledge of whether the Plaintiff had been vaccinated, or not, and there were multiple extensions of vaccine requirements and so called "leaves of absences" which demonstrates that there could be no real, underlying basis for an undue hardship defense

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

27. All conditions precedent to filing claims under Title VII, the ADA and the ADEA have been performed or have occurred.

28. The Plaintiff filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commissions ("EEOC") and dual filed with the Pennsylvania Human Relations Commission ("PHRC") on September 23, 2022, docketed as 530-2022-07170.

29. The Plaintiff has fully exhausted her administrative remedies as to her federal claims and is entitled to file in district court (see **Exhibit D**).

30. The Plaintiff will seasonably amend her pleadings to include her claims against CHN and the individual defendants falling under the Pennsylvania Human Relations Act ("PHRA") once they have been fully exhausted at the Pennsylvania Human Relations Commission ("PHRC").

## REASONABLE ACCOMODATION OPTIONS UNJUSTIFIABLY REJECTED BY DEFENDANTS

31. EEOC Guidelines have made clear that "when there is more than one means of accommodation which would not cause undue hardship"—which existed in Plaintiff's case— "the employer . . . must offer alternative which least disadvantages the individual with respect to his or her employment opportunities." *See EEOC Commission Guidelines*, 29 C.F.R. § 1605.2(c)(2)(ii).

32. Defendants could have accommodated Plaintiff's sincere religious beliefs without undue hardship (indeed, with no cost whatsoever, if Plaintiff paid for testing). Further, Defendants failed to engage in the interactive process to legitimately consider all possible accommodations. This caused Defendants to overlook accommodations posing less than a *de minimis* burden including: (1) testing for COVID antibodies and acknowledging that Plaintiff's natural immunity satisfied Defendants' immunization requirements (because it is

superior to vaccine-induced immunity); (2) weekly testing for COVID-19 (which is a more reliable indication of safety than vaccination); (3) testing/masking when required to attend to colleagues or patients; or (4) any combination of the above.

33. At the time of Plaintiff's termination, the CDC had conclusively stated that individuals vaccinated for COVID-19 could nevertheless contract and spread COVID-19. On March 29, 2021, the Director of the CDC Rochelle Walensky publicly stated that the CDC's own data "suggests, you know, that vaccinated people do not carry the virus, don't get sick, and that it's not just in the clinical trials but it's also in real world data."[1]

34. However, because the real-world data already demonstrated breakthrough infections in the vaccinated just three months after the Pfizer-BioNTech vaccine received FDA approval, the CDC immediately thereafter clarified Director Walensky's statements and confirmed that vaccinated individuals do in fact become infected and spread the virus to others. *See* CDC Reverses Statement by Director, (April 2, 2021), available at:

---

[1] Statement from CDC Director Rochelle P. Walensky, MD, MPH on Rachel Maddow Show (March 29, 2021), transcript available at: https://www.msnbc.com/transcripts/transcript-rachel-maddow-show-3-29-21-n1262442?utm_content=buffer7fb12&utm_medium=Arianna&utm_source=LinkedIn&utm_campaign=Buffer.

https://thehill.com/changingamerica/well-being/546234-cdc-reverses-statement-by-director-that-vaccinated-people-are-no/.

35. Before instituting its vaccination policy, Defendants knew or reasonably should have known that the vaccines were largely ineffective at controlling the spread of COVID-19. As early as July 2021, Director Walensky admitted that the vaccinated had similarly high viral loads of SARS-CoV-2 as the unvaccinated and thus could still contract and spread the Delta variant.[2]

36. In August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission. The study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated and were not only just as likely to transmit the virus as the unvaccinated but posed a greater contagion risk due to the increased likelihood of asymptomatic infection.[3]

---

[2] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC News Room (July 30, 2021), available at https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html [https://perma.cc/VR5V-E67A] ("Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARSCoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

[3] *See* Kasen Riemersma, et. al, *Shedding of Infectious SARS-CoV-2 Despite Vaccination, medRxiv* (August 24, 2021), available at: https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

37. Highlighting the irrationality of Defendants' continued pursuit of enforcing its mandate against religious and disabled employees, Defendants refused to recognize natural immunity as satisfying its immunization requirement. This is despite the fact that the international scientific community had conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity. *See Plotkin's Vaccines*, 7th Edition, at Section 2.

38. Defendants is a sophisticated healthcare company which focuses on creative and collaborative medical services and should have been aware of the fallacy of enforcing its vaccination Policy in the context of undue hardship and failed to even consider the religious beliefs or disability of the Plaintiff when determining whether it could exempt her.

39. Recognizing Plaintiff's natural immunity to COVID-19 as an alternative to vaccination would have required no cost or action of Defendants and would have imposed no logistical or administrative burden on Defendants. It would have simply required that Defendants acknowledge scientific reality.

40. Alternatively, periodic COVID-19 testing—or even testing when travel to customer offices was required—would also have been a costless accommodation. As the CDC recognized in August of 2021, COVID-19

vaccines work "with regard to severe illness and death—they prevent it. But what they can't do anymore is prevent transmission."[4]

41. Because vaccinated individuals may also contract and transmit COVID-19, a negative COVID-19 test is a more reliable indication of safety from the virus than a vaccination at some earlier time. This fact was also well-known at the time Defendants failed to accommodate Plaintiff and should have been considered as a reasonable accommodation to the vaccine mandate.

42. Having Plaintiff wear a mask and test when she was tending to patients or having meetings was another possible reasonable accommodation, one that had been applied during the Pandemic when vaccines were unavailable.

43. Furthermore, as Defendants' peers in the industry have shown—including vaccine manufacturer Janssen (J&J)—religiously exempt employees may be accommodated without increased risk or cost through testing and masking.

## APPLICABLE LAW UNDER TITLE VII

44. Title VII prohibits Defendant from discriminating against employees based on their religion. 42 U.S.C. § 2000e-2(a)(1). This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . .

---

[4] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021),
available at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

religious observance or practice without undue hardship on the conduct of the

employer's business." 42 U.S.C. § 2000e(j).

45. In other words, an employer must "make reasonable accommodation for the

religious observances of its employees, short of incurring an undue hardship."

*EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008)

(quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

46. This allows a plaintiff to raise claims of religious discrimination under both

a disparate treatment theory and a failure-to-accommodate theory. *Chalmers*

*v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996).

47. Failure to engage in the interactive process to find a solution for an exempt

employee "is not an independent violation of Title VII. But as a practical

matter, such failure can have adverse legal consequences [because] where an

employer has made no effort to act on an accommodation request, courts have

found that the employer lacked the evidence needed to meet its burden of

proof to establish that the plaintiff's proposed accommodation (or proposed

continued accommodation) would actually have posed an undue hardship."

EEOC Guidance, *Section 12: Religious Discrimination*, Part 12-IV.A.2

(citing *EEOC v. Ithaca Indus., Inc.*, 849 F.2d 116, 118-19 (4th Cir. 1988)

(finding that employer's failure to attempt to accommodate, absent any

showing of undue hardship, violated Title VII)); *see also EEOC v. Arlington*

*Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("After failing to pursue . . . any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate (or continue accommodating) reasonably [plaintiff's] religious needs without undue hardship on the conduct on its business.").

48. Title VII also prohibits Defendant from retaliating against an employee for engaging in protected activity. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 571 (3d Cir. 2002) *see also*, *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006) *Ferra v. Potter*, 324 F. App'x 189, 192 (3d Cir. 2009) ("As this Court has explained, '[w]ith respect to `protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made un-lawful by Title VII. . . .'").

49. Additionally, placing Plaintiff on a leave of absence as to the need to be vaccinated and then telling her she would be terminated later once the leave was lifted, and then terminating her, is a violation of applicable law.

## FIRST CLAIM FOR RELIEF
## ADA DISABILITY DISCRIMINATION

50.     Plaintiff incorporates herein the previous averments as if fully set forth.

51.     Plaintiff is a qualified individual with a disability under the PHRA due to her anxiety and defendants' notice of the same.

52.     The Plaintiff had a record of disability and/or was regarded as disabled by the Defendant.

53.     The ADA prohibits discrimination in the workplace against employees who have, *inter alia*, sought assistance for accommodation in the workplace.

54.     Plaintiff requested accommodation pursuant to state and federal law, i.e., medical exemption from vaccine.

55.     Defendant failed to accommodate Plaintiff's disability and instead, suspended and fired her when she sought leave for medical reasons related to her disability.

**WHEREFORE**, Plaintiff prays that this Honorable Court will order all appropriate relief pursuant to ADA and any other applicable statutory remedies including but not limited to monetary relief for the Plaintiff, including as applicable compensatory damages including wage loss, pain and suffering and punitive relief as well as all reasonable attorney's fees and costs of litigation.

<u>**SECOND CLAIM FOR RELIEF**</u>
**ADA DISABILITY-HOSTILE WORK ENVIRONMENT**

56.     Plaintiff incorporates herein the previous averments as if fully set forth.

57.     The Plaintiff avers that she is a qualified individual with a disability under the ADA due to her anxiety and Defendant's notice of the same. Additionally, the Plaintiff has been under a physician's care for her disabilities since she was diagnosed.

58.     The Plaintiff was subject to unwelcome harassment after she sought disability accommodations.

59.     Further, the harassment was sufficiently severe or pervasive as to alter the conditions of Plaintiff's employment and to create an abusive and hostile working environment because the Plaintiff was harassed due to her medical and mental health conditions when her supervisor, human resources and corporate relations bullied and intimidated her when she sought medically related workplace accommodations.

60.     Defendant knew, or reasonably should have known of the harassment, and failed to take prompt, effective remedial action, instead taking adverse action against the Plaintiff by suspending and then firing her.

61.     The fact that the Plaintiff's supervisors were perpetrators of the harassment entitles the Plaintiff to strict liability for her claims.

**WHEREFORE**, Plaintiff prays that this Honorable Court will order all appropriate relief pursuant to ADA and any other applicable statutory remedies including but not limited to monetary relief for the Plaintiff, including as applicable compensatory damages including wage loss, pain and suffering and punitive relief as well as all reasonable attorney's fees and costs of litigation.

## THIRD CLAIM FOR RELIEF
### ADA DISABILITY RETALIATION

62.    Plaintiff incorporates herein the previous averments as if fully set forth.

63.    The ADA prohibits retaliation in the workplace against employees who have, *inter alia*, sought assistance for accommodation in the workplace, or have otherwise opposed practices made unlawful under the law.

64.    The Plaintiff's requests for accommodation in the workplace constituted "protected activity" pursuant to state and federal law.

65.    Defendant retaliated against the Plaintiff on account of her protected activity when it suspended and then fired her after she sought medical leave accommodations related to her disability and after she ongoing harassment.

66.    Further, Plaintiff raised specific objections as to why she was being suspended and why the suspension, or as the Defendant calls it, leave of absence was being called an accommodation, especially given that the failure to take the vaccine after a thirty (30) day leave would result in termination.

67.    Furthermore, Plaintiff avers that the Defendant's purported basis to harass, suspend and terminate her (e.g., exemption would be an undue hardship) is false and erroneous and a pretext for underlying invidious reasons especially given that the defendant had permitted requests for exemption based on medical and religion, employee's records of vaccine are "confidential and privileged" according to Defendant in its PHRC responses to the Plaintiff's PHRC

Complaint, thus the public would have no knowledge of whether the Plaintiff had been vaccinated, or not, and there were multiple extensions of vaccine requirements and so called "leaves of absences" which demonstrates that there could be no real, underlying basis for an undue hardship defense.

68.     As a result, the Plaintiff avers that the Defendants retaliated against her on account of her protected activity by imposing suspension and discharging her without justification.

**WHEREFORE**, Plaintiff prays that this Honorable Court will order all appropriate relief pursuant to ADA and any other applicable statutory remedies including but not limited to monetary relief for the Plaintiff, including as applicable compensatory damages including wage loss, pain and suffering and punitive relief as well as all reasonable attorney's fees and costs of litigation.

**FOURTH CLAIM FOR RELIEF**
**TITLE VII – RELIGIOUS DISCRIMINATION –**
**FAILURE TO ACCOMMODATE**
(42U.S.C. § 2000e-2(a)(1))

69. Plaintiff incorporates herein the previous averments as if fully set forth.

70. An employee may assert a claim, for his employer's failure to accommodate, or continue accommodating an existing accommodation, of his sincere religious beliefs, so long as the accommodation does not impose undue hardship on the employer. *See Storey v. Burns Intern. Sec. Servs.,* 390 F.3d 760, 764 (3d Cir. 2004) ("An employer's failure to reasonably accommodate

an employee's sincerely held religious belief that conflicts with a job requirement can also amount to an adverse employment action unless the employer can demonstrate that such an accommodation would result in 'undue hardship.'").

71. To establish a prima facie claim for failure to accommodate a plaintiff must present evidence that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Wilkerson v. New Media,* 522 F.3d 315, 319 (3d Cir. 2008) ("To establish a prima facie case of a failure to accommodate claim, the employee must show: (1) she has a sincere religious belief that conflicts with a job requirement; (2) she told the employer about the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement.") (*Quoting Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

72. Once the plaintiff has made out a prima facie case for discrimination, "the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Groff v. Dejoy,* 35 F.4th 162, 169 (3d Cir. 2022).

73. Plaintiff clearly established her "bona fide religious belief" and its conflict with the Policy when she submitted her religious accommodation request to Defendant. Because Plaintiff could not receive the COVID-19 vaccine without violating her religious beliefs, she could not comply with the Policy and was thus subject to adverse action through both "temporary leave of absence" and subsequent termination. While Defendant may now attempt to challenge Plaintiff's beliefs, it is not the employer's place to question or interpret an employee's religious beliefs, *Equal Employment Opportunity Commission v. Geo Group, Inc.,* 616 F.3d 265, 291 (3d Cir. 2010) ("An employer is not entitled to interpret the employee's religion and determine what is and is not religiously acceptable to them.").

74. Defendant provided a reasonable accommodation option but one which was only temporary and furthermore chose to chill the employee's faith-based requests by telling her she would be terminated based on a deadline if she was not in compliance. Thereafter, it terminated Plaintiff without engaging further in any interactive process to attempt to find workable continuing accommodation that would not pose an undue hardship to the company. Even if not a standalone claim, the failure to engage in a meaningful interactive process signals an employer's violation of its duty to accommodate because

the employer is attempting to remain purposefully ignorant of potential reasonable accommodations.

75. To establish the defense of "undue hardship," Defendant must demonstrate that any of the aforesaid accommodations would "bear more than a *de minimis* cost" on the company. *Hardison*, 432 U.S. at 84.

76. At CHN, a medical assistant who was fully vaccinated, went on vacation in Michigan. Upon his return, he infected the whole pediatric office. Surely this was costly to CHN's business, yet, CHN insisted that everyone must be vaccinated without exemption, which literally had no effect on transmission of the virus and costs to CHN.

77. Thus, it would not have been costly to allow Plaintiff to be accommodated and provide her with testing and masking as it would have maintained the status quo and CHN would not have been given a false sense of security by emphasizing vaccines without testing. Consequently, testing was a viable alternative to vaccines and was a better indicator of who may be able to infect others with the virus.

78. Defendant also made several deadline extensions on its vaccine mandate.

79. This is evidence that it was not of any urgency to vaccine the CHN population, else they would have given a deadline and stuck to it.

80. Furthermore, the Defendant allowed for a thirty day leave of absence for its staff who was seeking medical and religious exemptions for the vaccine.

81. How then can Defendant claim exemptions would cause an undue hardship when valuable employees were forced from their jobs for thirty (30) days which left CHN short staffed.

82. Once more, Defendant states vaccine exemptions would undermine the public trust, yet by the Defendants own admission, the vaccine records of its staff are confidential and privileged (see Exhibit D – Response to Plaintiff's administrative complaint).

83. Thus, how could the public trust be undermined when it would have no knowledge of who was vaccinated and who was not.

84. Furthermore, the ability to provide reasonable accommodations to employees such as Plaintiff is also evident by considering other companies similarly situated to Defendant—including countless hospitals and even COVID-19 vaccine manufacturers such as Janssen (J&J)—that were able to accommodate employees with religious and disability based objections to mandatory COVID-19 vaccination policies.

85. Defendant is thus without excuse as to why it failed also to follow federal employment law in this regard.

86. Title VII requires an employer to thoroughly consider all possible reasonable accommodations and not just reject requests out of hand with form denials. "If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective."[5]

87. Such accommodation might include things such as masking and testing. In the face of the reasonable options proposed here, Defendant cannot demonstrate even a *de minimis* burden in providing Plaintiff with accommodation.

88. To be sure, testing was a reasonable accommodation even for people physically entering the workplace—it is undisputed that someone cannot catch COVID-19 from someone who does not have COVID-19. And to the extent that Plaintiff would even need to be in contact with other employees or patients, a negative COVID-19 test would have confirmed that she was less of a contagion hazard than untested individuals who were vaccinated at some earlier point in time but who could still contract and transmit COVID-19.

89. In denying Plaintiff's request, Defendant blankly asserted "significant undue hardship" and provided no justification as to why or how the several options she proposed (and were clearly available as it had so accommodated her) were

---

[5] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2.

unable to be done without undue hardship. This is especially true where recognition of Plaintiff's natural immunity (for example) required no cost, effort, or operational change to the status quo.

90. Moreover, Defendant was on actual of notice both, the many possible accommodation options for Plaintiff (as it had provided some from prior use of masks and testing) and the fact that the failure to continue using one or more of them would result in a Title VII violation. Nonetheless, Defendant forged forward with its campaign to eliminate its religious employees, including Plaintiff.

91. Plaintiff's age was taken into consideration when CHN fired her and but for her age she would not have been terminated. Specifically, Plaintiff was sixty (60) years old at the time of her termination. She was replaced, upon information and belief, with Lynn Denning, in her thirties.

92. Therefore, Defendant unlawfully discriminated against Plaintiff based on her sincerely religious beliefs by failing to accommodate or continue accommodating those beliefs. Defendant cannot demonstrate that doing so would have imposed any hardship whatsoever, let alone undue hardship.

## FIFTH CLAIM FOR RELIEF
## TITLE VII – RELIGIOUS DISCRIMINATION – DISPARATE TREATMENT
### (42U.S.C. § 2000e-2(a)(1))

93. Plaintiff incorporates herein the previous averments as if fully set forth.

94. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a). 116. A prima facie case for retaliation requires a showing "that (1) she engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Ortiz v. Delta Dental of Pa.,* Civil No. 1:18-CV-456, at *11 (M.D. Pa. May 13, 2020).

95. Here, Plaintiff engaged in protected activity under Title VII when she sought a religious accommodation from the Policy that would otherwise require her to violate her sincere religious beliefs and opposed being forced to take a vaccine that was against her beliefs.

96. Then, because of her request for accommodation, Defendant subjected Plaintiff to its sham process in violation of federal law.

97. Defendant never intended to accommodate Plaintiff. As a result, she was forced from her employment.

98. Were it not for Plaintiff's religious beliefs and her request for accommodation, she would not have been subjected to such treatment.

99. Plaintiff was then placed on a "temporary leave of absence" with the caveat that she would later be terminated —a further coercive technique—only to terminate her at the end of the set period of temporary accommodation.

100.     Upon information and belief, Defendant imposed the period of temporary accommodation with the intent to punish those who sought religious accommodations.

101.     Further, Plaintiff was exposed to physicians that were told by the Defendant that they could not write a script or letter providing support for accommodation.

102.     Defendant hoped that the constant reminder of termination would result in Plaintiff abandoning her religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

103.     Defendant' Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

104.     But for her request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of unpaid leave where she was constantly pressured to violate her beliefs.

105.    Defendant also terminated Plaintiff for seeking a continued religious accommodation to its compulsory vaccination policy. Plaintiff maintained her request for accommodation through the date of her termination.

106.    Separately, Defendant refused to admit its mistake and bring Plaintiff back even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and (3) individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to Defendant' illegal employment practice. The company had made up its mind to purge as many unvaccinated religious employees as it believed it could and the position against those seeking accommodations had become entrenched.

107.    Defendant' actions forced those denied accommodation onto temporary accommodation just to terminate them after an arbitrary specified period, and then not bringing them back when it was possible constitutes retaliation in violation of Title VII.

**<u>SIXTH CLAIM FOR RELIEF</u>**
**<u>TITLE VII – RETALIATION – OPPOSITION CLAUSE</u>**
(42 U.S.C. §2000e-3(a))

108.    Plaintiff incorporates herein the previous averments as if fully set forth.

109.    Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a).

110.     A *prima facie* case for retaliation requires a showing "that (1) he engaged in activity protected; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action." *Ortiz,* Civil No. 1:18-CV-456, at *11.

111.     Here, Plaintiff engaged in protected activity under Title VII when she sought a religious accommodation from the Policy that would otherwise require her to violate her sincere religious beliefs. Plaintiff continued to oppose Defendant's unlawful practice through her formal termination.

112.     Then, because of her request for accommodation, Defendant subjected Plaintiff to its process to coerce her from exercising her rights under federal law. Defendant's Policy was not designed to look for reasonable accommodation for Plaintiff because Defendant never intended to fully accommodate Plaintiff. Were it not for Plaintiff's beliefs and her request for accommodation, she would not have been subjected to such treatment.

113.     After denying Plaintiff's request, AND Plaintiff's opposition thereto, and granting a provisional accommodation in violation of the law, Defendant pressured her to capitulate and get the COVID-19 vaccine with false information that Defendant could not continue accommodating her beliefs. Defendant then placed her in temporary accommodation—a further coercive technique—only to terminate her at the end of the set period of time.

114.    Defendant imposed a temporary accommodation with the intent to punish those who sought religious accommodation; hoping that the constant reminder of termination would result in them abandoning their religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

115.    Defendant's Policy forced those who were denied religious accommodations or placed in temporary accommodations with the caveat of impending termination, into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

116.    But for her request for religious accommodation, Plaintiff would not have experienced the psychological and emotional distress from the period of temporary accommodation where she was constantly pressured to violate her religious beliefs.

117.    Defendant also terminated Plaintiff for seeking a religious accommodation to its compulsory vaccination Policy. Plaintiff maintained her request for accommodation through the date of her termination. Defendant terminated Plaintiff in close temporal proximity to her requesting religious accommodation and/or seeking continued accommodations.

118.    Separately, Defendant refused to admit its mistake and bring Plaintiff back even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; and

(3) individuals with natural immunity possessed superior immunity to those with the vaccine only. Such actions were due to Plaintiff's opposition to Defendant' illegal employment practice. The company had made up its mind to purge as many unvaccinated religious employees as it believed it could and the position against those seeking accommodations had become entrenched.

119.     Defendant's actions in forcing those denied accommodation as sought into temporary accommodation just to terminate them after an arbitrarily specified period constitutes retaliation in violation of Title VII.

## SEVENTH CLAIM FOR RELIEF
## ADEA DISCRIMINATION – DISCHARGE

120.     Plaintiff incorporates herein the previous averments as if fully set forth.

121.     Plaintiff is over the age of forty (40) and thus in a protected class.

122.     Plaintiff was qualified for her position.

123.     Plaintiff performed her duties in a satisfactory manner.

124.     CHN took adverse action against Plaintiff when it fired her and replaced her with a substantially younger person, Ms. Denning, who is in her thirties.

125.     Thus, the reason offered by CHN for the firing the Plaintiff, that she did not take the COVID-19 vaccine, is merely a pretext for unlawful discrimination.

126.     Thus, "But-for" the Plaintiff's age she would not have been fired.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment against Defendant for all appropriate remedies under the ADEA Including but not limited to: back pay and benefits, front pay where appropriate, and liquidated damages due to the malicious actions of CHN.

## PRAYER FOR RELIEF

127.    Plaintiff incorporates herein the previous averments as if fully set forth.

**WHEREFORE**, Plaintiff prays that this Court:

(a)    Declare Defendant violated Title VII and the ADA by failing to engage in the interactive process in response to Plaintiff's request for accommodations to its Policy and, instead, preemptively denying her request based on pretextual reasons.

(b)    Declare Defendant violated Title VII and the ADA for its failure to provide reasonable accommodation and disparately treated Plaintiff due to her clearly articulated religious beliefs and her disability when numerous no-cost or de minimis options were available.

(c)    Declare that Defendant violated Title VII and the ADA by retaliating against Plaintiff for engaging in protected activity through seeking religious and disability accommodation.

(d)     Declare Defendant violated the ADEA by terminating the Plaintiff due to her age sixty (60) years old and replacing her with a younger, less experienced Ms. Denning who is in her thirties.

(e)     Award Plaintiff damages, including back pay, front pay, pre-judgment, and post-judgment interest, liquidated and/or punitive damages, and compensatory damages and other affirmative relief necessary to eradicate the effects of Defendant' unlawful employment practices.

(f)     Award Plaintiff damages necessary to make her whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, and punitive relief in an amount to be determined at trial.

(g)     Award reasonable attorney fees and costs; and

(h)     Award such other and further relief that this Court may deem just and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby respectfully demands trial by jury on all counts so triable.

DATED this the 27th day of April 2023.

By: /s/ Jeremy A. Donham, Esquire
Jeremy Donham, (206980)
**DONHAM LAW**
714 Venture Drive, Ste. 144
Morgantown, West Virginia 26508
717.881.7855 (phone)
J.Donham@Donhamlaw.com

Charles J. Hobbs (209321)
**THE HOBBS LAW FIRM**
256 E. Market Street
York, PA 17403
(717) 793-2398 (Phone)
Email: chobbs@thehobbslawfirm.com